FILED
2026 Sep-25 AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ETHAN TAYLOR** | } | |
| **Plaintiff,** | } | |
| **v.** | } | **Case No.: 2:23-cv-01609-MHH** |
| **THE MONEY SOURCE, INC.** | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION AND ORDER**

Ethan Taylor has sued his former mortgage servicer, The Money Source, Inc., under the Servicemembers Civil Relief Act. (Doc. 1). TMS has asked the Court to enter summary judgment in its favor on Mr. Taylor's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 35). This opinion addresses TMS's motion. The Court begins with an overview of the legal standard that governs motions for summary judgment. Then, consistent with that standard, the Court summarizes the evidence in the summary judgment record and analyzes Mr. Taylor's SCRA claim based on the summary judgment evidence.

**I.**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1351 (11th Cir. 2024), *cert. denied sub nom. Terrell v. McDonough*, 145 S. Ct. 273 (2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alteration in *Terrell*).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Anderson*, 477 U.S. at 255).

"[A] litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano*, 707 F.3d at 1253 ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Still, "[c]ontentions based on 'mere speculation and conjecture' cannot defeat summary judgment." *Terrell*, 98 F.4th at 1351 (quoting *Cincinnati Ins. Co. v. Metro. Props., Inc*., 806 F.2d 1541, 1544 (11th Cir. 1986)); *see TocMail, Inc. v. Microsoft Corp*., 67 F.4th 1255, 1263 (11th Cir. 2023) ("It's not enough 'to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit.'") (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023) (quoting *Rollins v. TechSouth, Inc*., 833 F.2d 1525, 1529 (11th Cir. 1987)).

**II.**

Mr. Taylor enlisted in the Army National Guard in 2002. (Doc. 45-1, p. 9, tp. 32). Mr. Taylor trained for one year and then served in reserve status until August 2007. (Doc. 45-1, pp. 9–10, tpp. 32–33). Mr. Taylor joined the Army Reserves in July 2010. (Doc. 45-1, p. 10, tpp. 33–35). On October 1, 2019, Mr. Taylor began working under Active-Duty Operational Support Orders. (*See* Doc. 36-1, p. 4, ¶ 11;

Doc. 36-1, p. 37; Doc. 36-4, p. 6). Under those orders, Mr. Taylor completed temporary, need-based projects at an Army Aviation Support Facility. (*See* Doc. 36-1, pp. 29, 37; Doc. 36-4, p. 6).

In June 2020, Mr. Taylor applied for a mortgage loan from Veterans United Home Loans. (Doc. 36-1, pp. 29–32). On his loan application, Mr. Taylor represented that he had been employed at "Army Aviation Support Facility #2" since fall 2002. (Doc. 36-1, p. 29). On June 25, 2020, Veterans United loaned Mr. Taylor $151,404.00 to purchase a residential property in Birmingham, Alabama. (Doc. 36-1, p. 3, ¶ 8; Doc. 36-1, pp. 13–14).

In September 2020, Mr. Taylor's Operational Support Orders expired. (*See* Doc. 36-1, p. 4, ¶ 11; Doc. 36-1, p. 37). A few months later, the Army ordered Mr. Taylor to report for active duty on May 29, 2021. (Doc. 45-1, p. 12, tpp. 42–44). During a pre-deployment briefing in Fort Bliss, Mr. Taylor learned that he might qualify for SCRA protections. (Doc. 45-1, p. 27, tpp. 101–102). In May 2021, Mr. Taylor deployed to Kuwait. (Doc. 45-1, p. 27, tp. 101). Shortly after he deployed, Mr. Taylor informed Veterans United that he was deployed in Kuwait. (Doc. 45-1, p. 27, tp. 102:15–20). A Veterans United representative told Mr. Taylor that Veterans United would pause his monthly mortgage payments while he was deployed. (Doc. 45-1, pp. 22–23, 27, tpp. 79–81, 102–103). Mr. Taylor did not receive from Veterans

United documents that described the terms of the pause or confirmed Mr. Taylor's participation. (*See* Doc. 45-1, p. 22, tpp. 81–82).

On July 21, 2021, Veterans United sent Mr. Taylor a pandemic forbearance plan confirmation letter that indicated Veterans United would pause Mr. Taylor's loan payments for August, September, and October 2021 because Mr. Taylor was experiencing financial hardship. (Doc. 36-1, pp. 69–71). Veterans United extended Mr. Taylor's forbearance period through January 2022. (*See* Doc. 36-1, pp. 74–75). Mr. Taylor did not make payments on his mortgage while the loan was in forbearance. (Doc. 36-1, pp. 63, 67; Doc. 45-1, p. 28, tp. 107).

In early 2022, Mr. Taylor called Veterans United and informed their representative that he was extending his active-duty assignment. (Doc. 45-1, p. 26, tpp. 97–99). The representative informed Mr. Taylor that Veterans United had sold his mortgage to TMS and told Mr. Taylor that his loan terms would not change. (Doc. 45-1, p. 26, tp. 97).

In January 2022, Veterans United transferred Mr. Taylor's loan to TMS. (*See* Doc. 36-1, pp. 41–46). Veterans United did not notify TMS that Mr. Taylor was under active military orders or that Veterans United had agreed to pause Mr. Taylor's mortgage payments. (Doc. 36-1, p. 4, 5, ¶¶ 14, 18). When the transfer occurred, Veterans United did not have Mr. Taylor's loan coded for SCRA protections. (Doc. 36-1, p. 4, ¶ 13). Because Mr. Taylor's account indicated that Mr. Taylor had been

enrolled in a pandemic forbearance plan that had expired and because Mr. Taylor had not entered a repayment plan to address missed payments, when TMS received Mr. Taylor's loan, TMS treated the loan as if it were in default. (Doc. 36-1, pp. 4–6, ¶¶ 16–21; Doc. 36-1, pp. 69–72, 74–75).

In February 2022, Mr. Taylor contacted TMS about his mortgage, and in March 2022, he asked TMS to approve his loan for SCRA protections. (Doc. 36-1, p. 6, ¶ 22; Doc. 45-1, p. 35, tp. 134:8–21). Relying on Mr. Taylor's loan application in which he indicated that he had been employed at the "Army Aviation Support Facility 2" for more than 17 years, TMS determined that Mr. Taylor was on active duty when he obtained his mortgage in June 2020, so that the mortgage was not eligible for SCRA protections. (Doc. 36-1, p. 6, ¶¶ 23–24; Doc. 36-1, pp. 29, 37). DoD records confirmed that Mr. Taylor was on active duty from October 1, 2019 through September 30, 2020. (Doc. 36-1, p. 6, ¶ 25). Therefore, TMS denied Mr. Taylor's request for SCRA protection. (Doc. 36-1, p. 77).

On March 21, 2022, TMS notified Mr. Taylor that he had breached his loan agreement by failing to make payments from August 1, 2021, through March 21, 2022. (Doc. 45-1, p. 28, tp. 105:6–106:23). In May 2022, TMS initiated non-judicial foreclosure proceedings. (Doc. 36-1, p. 6, ¶ 26). TMS charged Mr. Taylor more than $4,000 in foreclosure-related fees. (*See* Doc. 45-1, p. 38, tp. 147; Doc.

36-1, pp. 85–86, 89).[1] Mr. Taylor contested TMS's determination that his loan was not eligible for SCRA productions, and TMS reconsidered its eligibility determination. (Doc. 36-1, pp. 6–7, ¶ 27). In June 2022, TMS cancelled the foreclosure proceedings and refunded Mr. Taylor the foreclosure costs TMC had charged. (Doc. 36-1, pp. 7, ¶ 30; *see* Doc. 36-1, pp. 82, 87–89).[2] In August 2022, TMS determined that Mr. Taylor was entitled to SCRA protection on his loan. (Doc. 36-1, p. 7 ¶ 29; Doc. 36-1, pp. 79–80).

**III.**

The Servicemembers Civil Relief Act "provide[s] for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 U.S.C. § 3902. Under 50 U.S.C. § 3953, the SCRA prohibits non-judicial foreclosure of a servicemember's property "during, or within one year after, the period of the servicemember's military service." 50 U.S.C. § 3953(b). These foreclosure protections apply "only to an obligation on real or personal property owned by a servicemember that . . . originated before the period of the

---

[1] Mr. Taylor's testified that, after TMS initiated the foreclosure, his credit report reflected a $4,739 increase in his loan balance. (Doc. 45-1, pp. 38, 147:10–22). TMS's records show that the company reported a $4,206 increase in Mr. Taylor's loan balance in June 2022. (Doc. 36-1, pp. 85–86, 89).

[2] TMS's August 2022 credit bureau report reflects that Mr. Taylor owed $2,081 less than the month before; TMS's September 2022 credit bureau reports reflects that Mr. Taylor owed $750 less than the month before. (Doc. 36-1, pp. 87–89).

servicemember's military service and for which the servicemember is still obligated." 50 U.S.C. § 3953(a). This case presents a novel question regarding the scope of the SCRA's mortgage protections, namely whether an obligation that a reservist incurs during one period of military service is considered an obligation that "originated before the period of the servicemember's military service" during the reservist's later, non-consecutive periods of service.

Statutory interpretation "'begin[s] with the statutory text,'" T-*Mobile S., LLC v. City of Roswell*, 176 F.4th 1245, 1249 (11th Cir. 2026) (quoting *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)), but "courts must interpret the relevant words of a statutory provision not in a vacuum, but with reference to the statutory context, structure, history, and purpose of the law," *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258, 1265–66 (11th Cir. 2026) (quoting *Perez v. Owl, Inc*., 110 F.4th 1296, 1308 (11th Cir. 2024)) (in turn quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)). Accordingly, to determine whether the SCRA covers Mr. Taylor's mortgage, the Court "look[s] to (first and foremost) the text, then to the broader statutory structure, history, and, if necessary, to the congressional purpose of" the legislation. *See Hernandez Alvarez*, 175 F.4th at 1265–66.

The plain language of the SCRA covers mortgage obligations that servicemembers incur before military service. *See United States v. Schreck*, 130 F.4th 1297, 1302 (11th Cir. 2025) ("Under principles of statutory interpretation, we

look to the plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted.") (internal quotation omitted). Section § 3953(a) provides that the SCRA's mortgage protections "appl[y] only to an obligation on real or personal property owned by a servicemember that . . . originated before the period of the servicemember's military service and for which the servicemember is still obligated." 50 U.S.C. § 3953(a). "The term 'period of military service' means the period beginning on the date on which a servicemember enters military service and ending on the date on which the servicemember is released from military service or dies while in military service." 50 U.S.C. § 3911(3). For members of the Army like Mr. Taylor, "military service" means "full-time duty in the active military service of the United States." 50 U.S.C. § 3911(2); 10 U.S.C. § 101(d)(1). Thus, the SCRA's mortgage protections apply to obligations that a servicemember incurs before entering active duty. *See Sibert v. Wells Fargo Bank, N.A.*, 863 F.3d 331, 334 (4th Cir. 2017).

The SCRA contemplates a single period of military service. Section 3952(a) refers to "the period" of military service rather than "a" period of military service. 50 U.S.C. § 3953(a). The statute's use of a definite article– "the"– instead of an indefinite article – "a" – indicates that § 3953(a) refers to a specific period of service. *See Definite Article*, MERRIAM-WEBSTER (Aug. 27, 2026), https://www.merriam-webster.com/dictionary/definite%20article [https://perma.cc/2357-82XU] ("The

indefinite article is a; it identifies a single, but not specific, person or thing. . . . The definite article is the*;* it is used to refer to identified or specified people or things, both singular and plural."). One could plausibly read "the period" to refer to the current period of a servicemember's service. Yet § 3953(a)'s text "creates two classes of obligations." *See Sibert*, 863 F.3d at 335. "The statute "grants protection to obligations incurred *outside of* military service" and "den[ies] protection to obligations originating *during* the servicemember's military service." *Sibert*, 863 F.3d at 334 (italics in original). Thus, the most straightforward reading of § 3953(a) is that mortgage obligations that a servicemember incurs during military service are not subject to SCRA protections. *See Sibert*, 863 F.3d at 335 (holding that, where a borrower incurred a mortgage loan while enlisted in the Army, his mortgage lender did not violate the SCRA when the lender foreclosed on his mortgage after the borrower had left the Army and re-enlisted in the Navy). [3]

---

[3] The *Sibert* case concerns the SCRA's application to obligations incurred during a regular-component servicemember's non-consecutive periods of service. *Sibert*, 863 F.3d at 335. The reasoning in *Sibert* is persuasive here. The SCRA defines "military service" in the same manner for reservists and for regular-component members of the armed forces. *See* 50 U.S.C. § 3911(2); 10 U.S.C. § 101(d)(1). Congress knows how to differentiate among categories of servicemembers for purposes of SCRA coverage. *Thompson v. United States*, 604 U.S. 408, 409 (2025) (quoting *Custis v. United States*, 511 U.S. 485, 492 (1994)). For instance, 50 U.S.C. § 3917 extends SCRA protections for reservists to the period between when a reservist receives his order and when the reservist reports for active duty. 50 U.S.C. § 3917(a). Congress's decision to enact a special rule for reservists in § 3917 demonstrates that Congress is aware of the distinct characteristics of reserve service and that Congress treats reservists differently than regular-component service members when Congress deems such treatment appropriate. Therefore, the lack of a distinction in § 3953(a) is telling. Under settled principles of statutory interpretation, Congress's express creation of a reservist-specific rule in one provision of the Act suggests that no such special rule applies elsewhere. *See U.S. Sec. & Exch. Comm'n v. Spartan Sec. Grp., Ltd.*, 164 F.4th 1231, 1267

Section 3953's broader context confirms that "the period" of a servicemember's military service includes all time spent on active duty. *See Sibert v. Wells Fargo Bank, N.A.*, 184 F. Supp. 3d 296, 301–02 (E.D. Va. 2016), *aff'd*, 863 F.3d 331 (4th Cir. 2017). The SCRA protects servicemembers' qualifying mortgage obligations in two ways. *See* 50 U.S.C. § 3953(b), (c). Under § 3953(b),

> In an action filed during, or within one year after, a servicemember's period of military service to enforce [a qualifying obligation], the court may after a hearing and on its own motion and shall upon application by a servicemember when the servicemember's ability to comply with the obligation is materially affected by military service—
>
> > (1) stay the proceedings for a period of time as justice and equity require, or
> >
> > (2) adjust the obligation to preserve the interests of all parties.

50 U.S.C. § 3953(b). Under § 3953(c),

> A sale, foreclosure, or seizure of property for a breach of [a qualifying obligation] shall not be valid if made during, or within one year after, the period of the servicemember's military service except—
>
> > (1) upon a court order granted before such sale, foreclosure, or seizure with a return made and approved by the court; or
> >
> > (2) if made pursuant to an agreement. . . .

---

(11th Cir. 2026) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate.") (quoting *Badgerow v. Walters*, 596 U.S. 1, 11 (2022)).

50 U.S.C. § 3953(c). Subsections 3953(b) and (c) complement one another. *See Sibert*, 184 F. Supp. 3d at 302. Subsection 3953(c) invalidates non-judicial foreclosures when § 3953(b) would have provided a servicemember equitable remedies to prevent foreclosure, "but the foreclosing party bypassed the court." *Sibert*, 184 F. Supp. 3d at 302; *see* 50 U.S.C. § 3953(b), (c). "Accordingly, § [3953](a) must be interpreted in a manner that makes sense in light of both §§ [3953](b) and (c)." *Sibert*, 184 F. Supp. 3d at 302; *see Boroski v. Dyncorp Int'l*, 700 F.3d 446, 452 (11th Cir. 2012) ("[A] court must . . . interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[] harmonious whole." (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))).

Interpreting § 3953(a) to cover obligations incurred during a reservist's prior periods of military service would create inconsistent results under §§ 3953(b) and (c). *Sibert*, 184 F. Supp. 3d at 302. Subsection 3953(b) applies only when a person's military service "materially affect[s]" that person's ability to meet their mortgage obligations. 50 U.S.C. § 3953(b). "For a person entering military service for the first time, the resulting change in income and lifestyle relative to when they incurred the obligation could materially affect their ability to maintain payments." *Sibert*, 184 F. Supp. 3d at 296. But a person who incurs an obligation during a period of military service, returns to civilian status, then begins another period of military

service, receives the income they received when they assumed the obligation; that person "has the same ability to comply with the obligation as when it was first negotiated and incurred." *Sibert*, 184 F. Supp. 3d at 302. Thus, reservists who incur an obligation while on active duty, like Mr. Taylor, are not entitled to relief under § 3953(b). Therefore, the most harmonious reading of § 3953(a) in light of §§ 3953(b) and (c) is that § 3953(a) does not cover mortgage obligations incurred during an earlier period of military service.

The SCRA's legislative history and purpose bolster this reading. Congress enacted the SCRA "to provide for, strengthen, and expedite the national defense" by suspending the enforcement of certain civil liabilities so that persons in military service could "devote their entire energy to the defense needs of the Nation," 50 U.S.C. § 3902(a), but "the Act does not apply merely because such person is in military service[] and is not to be invoked for a needless purpose, but is to be administered as an instrument to accomplish substantial justice," *Sibert*, 184 F. Supp. 3d at 301 (quoting *Brown Serv. Ins. Co. v. King,* 24 So.2d 219 (Ala. 1945)).

Congress intended the SCRA to relieve the financial pressures reservists face when they are called to active duty and leave a higher-paying civilian job and retain financial obligations they incurred while relying on their civilian salary. *See, e.g.,* 149 Cong. Rec. H3699 (2003) (statement by Rep. Gutierez) ("In various ways, members of the Armed Forces, and in particular members of the National Guard and

Reserve who leave jobs, good jobs, homes and families at a moment's notice, face tremendous economic burdens as a result of their willingness to serve.").[4] "In choosing to protect obligations incurred during civilian life, Congress recognized that those obligations could unexpectedly be impacted by entry into military service and the changes in the servicemember's income and status, which were not contemplated at the time the obligation was incurred." *Sibert*, 863 F.3d at 334. If a reservist incurs an obligation when he is on active duty, the reservist and his lender are aware of the impact the reservist's military service may have on his income. *See Sibert*, 863 F.3d at 334. Likewise, as discussed, a reservist who incurs an obligation during a period of military service does not face the same hardships as reservists who incur obligations as civilians and then experience a decrease in income during a period of active duty. Thus, extending SCRA protections to circumstances like Mr. Taylor's would not further the purposes of the statute.

[4] Legislators voiced similar concerns in 1991, when Congress amended the Soldiers and Sailors Civil Relief Act–a predecessor to the SCRA–to address the military's increased reliance on reservists and national guardsman for the national defense. *See* 137 Cong. Rec. 2367 (1991) (statement of Rep. Montgomery); Act of March 18, 1991, 105 Stat. 34. One of the amendment's sponsors explained:

> These amendments to the Soldiers' and Sailors' Relief Act will provide reservists on active duty and regulars in the military with certain protections. These protections are to help members of the military service who have financial obligations that have accumulated before they began their active duty and who cannot meet those obligations due to their participation in the Persian Gulf.

137 Cong. Rec. 2362 (statement of Rep. Montgomery).

Therefore, § 3953(a)'s plain text, the broader context of § 3953(b) and (c), and the SCRA's history and purpose indicate that § 3953(a) does not cover obligations that a servicemember incurs during military service.

Here, the record demonstrates that Mr. Taylor incurred his mortgage obligation during a period of active military service. Army reservists like Mr. Taylor participate in military service when they are on "full-time duty in the active military service of the United States." 50 U.S.C. § 3911(2); 10 U.S.C. § 101(d)(1). When Mr. Taylor applied for his mortgage loan, he listed Army Aviation Support Facility #2 as his current employer. (Doc. 36-1, p. 29).[5] Mr. Taylor worked at the facility under Active-Duty Operational Support orders. (Doc. 36-4, p. 6; *see* Doc. 45-1, pp. 10–12, tpp. 36:3–37:7, 40:5–42:3).[6] And Department of Defense records confirm

---

[5] Mr. Taylor's loan application indicates that he was employed by Nucor Steel Birmingham from May 2006 through December 2018. (Doc. 36-1, p. 29). Mr. Taylor represented that the Army was his sole employer when he applied for the loan at issue in 2020.

[6] Mr. Taylor contends that Active-Duty Operational Support orders are distinct from active orders. (*See* Doc. 41, p. 14). Mr. Taylor points to an email in which a JAG officer wrote:

> [r]eceiving ADOS orders permit the Active Army to use a Reserve Soldier for a set number of days for a mission and subject to the needs of the Army, they can continue to extend those orders. However, those orders will end and then the Army reservist goes back to drilling/civilian status. Thus, after they use you, you are back to the reserves and when you receive a new set of active-duty orders, the SCRA restarts as that reservist has been called back to active duty.

(Doc. 41, p. 14) (citing Doc. 36-4, pp. 6–7). Mr. Taylor has not identified, and the Court has not located, authority that indicates that a reservist on ADOS orders is not on active duty for purposes of the SCRA. The JAG officer's legal conclusion that "the SCRA restarts as that reservist has been called back to active duty" does not create a genuine issue of material fact. *See Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment.").

that, when Mr. Taylor applied for and obtained his mortgage, he was on active duty as an Army reservist. (*See* Doc. 36-1, p. 37). Thus, Mr. Taylor's mortgage was not covered by § 3953(a) because he incurred the obligation during his period of military service. *See* 50 U.S.C. §§ 3953(a), 3911(2); 10 U.S.C. § 101(d)(1).

**IV.**

For the reasons above, the Court grants TMS's motion for summary judgment. By separate order, the Court will enter a final judgment in favor of TMS. TMS's motions to strike are moot. The Clerk of Court shall please TERM Docs. 35, 49, and 52.

**DONE** and **ORDERED** this September 25, 2026.

Madeline H. Haikala

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

Similarly, Mr. Taylor asserts that TMS's decision to approve his loan for SCRA protections creates a genuine dispute regarding whether his loan was in fact covered by the SCRA. (Doc. 41, pp. 11–12). TMS's legal conclusion that Mr. Taylor's loan was entitled to SCRA protections does not create an issue of fact. *See Wood v. City of Lakeland*, 203 F.3d 1288, 1292 (11th Cir. 2000) ("[E]vidence setting forth legal conclusions are insufficient to meet the plaintiff's burden.").